Would the clerk call the next case, please? 3-16-0717, e-mail to the State of Illinois, a gentleman, Justin Nicolosi v. Rebecca Blair, a.k.a. Rebecca Simmons, amplified by Jay Whitman. Mr. Nicolosi? Good morning. Good morning, Your Honors. May it please the Court, Counsel? In this case, Sgt. Stephen Kijanowski of the Kewanee Police Department observed the defendant and her husband entering a Walgreens and exiting and then very shortly thereafter entering a CVS and then exiting. Each time, the respective person, the defendant went in one store, her husband went in the other store, came out with a bag, they got in their vehicle, and they drove away. Officer Kijanowski knew that the defendant's husband was driving on a revoked or a suspended license. Therefore, he initiated a traffic stop. He wasn't the one who stopped the vehicle, but initiated the stop. Sgt. Kijanowski knew of defendant prior to his observations on this day, which was September 30th. He had interacted with the defendant on May 4th of the same year, 2015. In that incident, Sgt. Kijanowski observed defendant with several items on a person, an empty pseudoephedrine package, which based on the sergeant's experience in the street crimes unit, which involves narcotics investigations, methamphetamine investigations, and the like, that pseudoephedrine is used in the making of methamphetamine. So the defendant not only had that on her person, she had straws, cellophane, and foil with residue on it, all of which Sgt. Kijanowski knows are used in the ingesting of narcotics. He also assumed that the residue on the foil was a narcotic. However, the defendant didn't face any charges from that day. She became an informant for the police. So fast forward again to where we were September 30th. He saw this behavior in what looks like an innocuous shopping trip to drugstores, but it isn't innocuous because the sergeant knew that people in the manufacture of meth, not only can they find most of the items needed to make meth at drugstores like this, but when people are involved with others in obtaining these items, they often separate themselves and they go to different stores and that's how they kind of stay under the radar and aren't detected. If you go buy everything at one store, it looks like you're making methamphetamine. So armed with this knowledge, the vehicle containing the defendant and her husband was stopped. And all of the stop was on two recordings. One of them carried the whole stop, one of them did not. But the first six minutes of the interaction once the vehicle was stopped involved the defendant's husband and he was questioned and he exited the car and he was arrested for driving without a valid license. Then the scene kind of shifted to the defendant and Sergeant Kijanowski is seen on camera approaching the defendant after approximately six minutes or so of the stop. He goes over to her and at this point I think it's necessary to set the scene as she, as the defendant, would have seen it. She was in the vehicle and then she exited on her own. This is on video. She exits the vehicle on her own before another officer has her get back in the vehicle, presumably for safety reasons. She's on the phone. She smokes a cigarette. This is all during the time of this stop just to kind of create the mood of what was happening here. But eventually she is being questioned by Sergeant Kijanowski. He comes over. He says, what did you buy? And then he says, do you remember me? And a very short conversation ensues and the defendant says that she bought, one of the bags was lithium batteries, the other bag was a coal pack. And Officer Kijanowski testified that he knows that those are also items that can be used to make methamphetamine. So he, again, Sergeant Kijanowski's knowledge based on his experience is critical to this case. Based on those materials, Sergeant Kijanowski says to her, says to the defendant, you have these two methamphetamine making materials, you have these charges hanging over her head, referring to the May 4th incident where she was not charged, despite possessing those items. He told her, you have connections to the meth game and you have, you're just telling me that you need batteries and coal packs. And Sergeant Kijanowski also knew that the defendant and her husband had been blocked from Walmart that day from buying pseudoephedrine because she had attempted to buy too many and there's a system that tracks the purchasing and the selling of that item because it is so commonly used to make narcotics. So based on all of that information, the defendant was eventually arrested and charged with the possession of methamphetamine manufacturing materials. Don't we have to determine whether or not he had enough to ask for what was in the bags? First, because they don't see ice packs and batteries, right? I mean, isn't that, you know, she's walking out of CVS and they have just that, you know, the bags with them. Sure. So did he call in the registry? He had another officer call in, Officer Reed. Because it seems that the, I don't know, Latouse case says that they had information from a pharmacist that was enough to justify it because other, you know, I don't know if the bags are enough. I mean, how do you know what's in those bags? You know, I mean, it could be anything that's sold there. It's a drugstore, sure. Even though they make trips to two different pharmacies or drugstores. I mean, is it enough to know that they've been blocked or do you have to have the other and that she's had trouble in the past? Yes, sir. I believe it's the totality, the cumulative effect of the experience that Sergeant Kijanowski has in the street crimes unit plus his personal interaction with the defendant and the shopping trip to CVS and Walgreens, which again, on the surface would certainly look pretty innocuous. But again, this is, we're not, it is not you and I who are looking at this shopping trip. It was an experienced street crimes officer who knows that this is the type of behavior that people who are in the business of making methamphetamine and other drugs typically employ. Well, I mean, isn't the issue before us whether the officer was required to Mirandize the defendant before asking her what's in the bag or what did you buy? Isn't that what's in front of us here? That's certainly the issue, Your Honor. And the people would submit that he did not need to Mirandize the defendant in this case because the defendant was not being subjected to custodial interrogation. And that's because this involves reasonable suspicion and not probable cause at this point. Just as Sergeant testified, he knew that the defendant has a history and association with methamphetamine materials and individuals. I didn't get into, with that May 4th incident, the defendant said that she was with a family called the Niebingers and that one of them had been convicted for possessing drug paraphernalia. She knew that they were involved in that, in the meth game, and she also lied about where she got those drug use items and admitted that she got them from him to burn. So this sergeant knew before, as he walked up to the vehicle, before he asked the defendant a specific question, that she associated with people who were involved in methamphetamine. She almost certainly used, at some point used the drug or else she wouldn't have had those items on her. She obviously lied about where she got those items to the sergeant. And again, she observed this behavior, this shopping trip, which again to the untrained eye would look like nothing, but to the trained eye, and I don't think there's any question that the sergeant knows this well. It just seems to me that, again, what's all that got to do with whether this is a custodial, I mean, he doesn't need probable cause or even anything to ask the question. Sure. The issue is, was this a custodial interrogation of her at the time he asked the question, what's in the bag or what did you buy? Is that it? Sure. So all this other stuff, what's that got to do with whether or not this woman was in custody at that point he asked her the question? Sure. And to that end, we'll move on to whether or not this was custodial interrogation, and I guess I should have started there. But there's a lot of factors that go into determining whether or not this was a custodial interrogation. And as the people argued in their brief, the lion's share of these factors that the people would submit weigh in favor of concluding that she was not in custody. For example, the location of this was on a public street. She was not taken to the station to be questioned. She was in her car. She just smoked and talking on the phone. This wasn't the type of isolated, oppressive circumstance that it certainly could have been. It was pretty casual. He walked up and just talked to her while she was in her own vehicle. This was during the daylight. There wasn't certainly a lot of questioning at all. Again, from the beginning of the traffic stop to her second statement about what was in the second bag, only nine minutes went by. And for the first six minutes, she wasn't the focus of any of this investigation. That was her husband who was arrested for driving without a valid license. And I think the videos show that the mood of this whole scene was not such an oppressive or aggressive mood. There's no yelling or aggression. There's no show of force. There's no showing of a weapon. It was just simple questioning by an officer who obviously had a relationship with this person before. They knew each other. The people would submit there wasn't an excessive amount of police officers or cars. There were four of them, weren't there? There were four, but they weren't exactly all around the car. It wasn't as if they were all in her face asking questions. Only one of them asked a question. Again, she was in her own car during this point. There's no indicia of a formal arrest. And the age, the intelligence of this individual, certainly she's not, it didn't appear she was susceptible to any kind of aggressive, over-aggressive tactics or anything like that. Was she free to leave? I don't believe she was free to leave, Your Honor. Would she have reasonably thought she was free to leave? I don't know, Your Honor, but again. Isn't that our test? But you can be not free to leave and still only be questioned based on reasonable suspicion. Under a Terry stop, which you are by definition not in custody, you are not free to leave during a Terry stop either. You can be subjected to brief questioning, and the people would submit that's exactly what happened here. The people would submit that the fact that she was in a car doesn't change this analysis whatsoever. That because Sergeant Kijanowski had reasonable suspicion to believe that she was purchasing or in the possession of methamphetamine-making materials, that he was able to detain her very briefly to ask questions. That's exactly what happened here. It was very brief. He got the answers pretty much right away when he asked the question. And that gave him the probable cause to then arrest her based on her history and his experience with this area of crime, I guess. So with that, the people would request that this Court reverse the trial judge's granting of the motion to suppress in this case. If there are any other questions, I'd be happy to answer them. I think there's a question. The Supreme Court in People v. Braggs said that in custody for purposes of Miranda happens when a person believes that a reasonably innocent person would believe that they were not free to leave. You have said that she was not free to leave and that a reasonable person would have believed that. So she was in custody, according to Braggs. I don't remember if I just said whether or not she had reason to believe that she was in custody. I don't remember if I answered that or not. But again, I'm also quoting the law that under a terrorist act, somebody doesn't have to be free to leave. And the officer can still ask questions briefly to investigate based on reasonable suspicion. That's one of those areas where you can justify prolonging a stop. And the people would submit that that's exactly what happened here. Thank you. Mr. Wigman. Good afternoon. May I please the court, counsel? I am Jay Wigman, an assistant appellate defender with the Office of the State Appellate Defender. Counsel for Defendant Appellee Rebecca Blair, who asserts that the trial court correctly found that her statements and evidence that was seized from the van in which she was a passenger should be suppressed because she was in custody and was not given Miranda warnings before she was interrogated by the detective. I think that the facts of this case and some of the issues can get rather convoluted. And I think that people can get lost within the details of the case. And toward that end, I would note that there were in fact three motions to suppress that were litigated in the trial court below. And I think that's what causes some of the combination of the question of reasonable suspicion, probable cause. But the fact of this question, or what is at the root of this issue, is the motion to suppress, which was found by the trial court as the basis for suppressing the evidence, is the question of whether Miranda warnings were given. And the giving of Miranda warnings requires the court to find that the encounter was custodial and that it was an interrogation. And both of those factors were properly found by the court in this instance. As has been noted by this court, there are five or six factors that were cited in Bragg's as being determinative of whether somebody is in custody or not. And most of those factors are in favor of the court's finding in this case. That is that the defendant was in custody when she was interviewed by the detective. One of the questions that comes up is how did the person come to be within the custody of the police? Now, in a typical situation, it's the defendant at the police station. And one of the questions, and it was a question of Bragg's, was how did the defendant get here? Did the defendant come on his own or her own? Was the defendant brought there by the police? Was there an indication that she was free to leave? In this instance, she was stopped by the police. Her husband was arrested, but the encounter continued. The husband was arrested within about two minutes. And that's another of the factors that comes into play here is while the state argued otherwise, she was separated from family at that point. She was separated from him. When he's in the back of a squat car, it can provide no support or assistance. She's been detained by the police and kept in a way that she was clearly not free to leave. When the judge found that she wasn't free to leave, he noted specifically there are four police officers, three cars, she's not free to go. And nobody in a reasonable person in those circumstances would think that she was free to go. But is that the end of the discussion? Counsel mentioned in a Terry stop, somebody's not free to go. So is Miranda required on a Terry stop where an officer might have reasonable articulable suspicion that a crime has been committed, but he doesn't know, and so he's trying to determine whether a crime has been committed and he's asking questions. Is Miranda required? The person's not free to leave on a Terry stop. And that's the second of the two elements that have to be demonstrated here. The first is custodial, and I was focusing on that. The second is whether it's an interrogation. And to that extent, reasonable suspicion, probable cause aren't at issue. I don't think that there was reasonable suspicion here. And in a Terry stop, what you're dealing with is typically not the interrogative portion of the question. For instance, in Haviland, decided by this court, the question was whether the question that was thrown out was interrogation or whether it was just a general question. And in that case, while this court set forth the six BRACS factors, it didn't discuss another factor that's generally answered as part of the custodial question, which is whether or not the defendant was a target of an investigation, whether the interrogation was focused and driven toward one person. And in this case, it wasn't Haviland, it was not. Well, for example, if you tell the officer, if he had said, what's in that bag? And she had said, well, one bag's got chewing gum, the other bag has Dr. Scholl's foot powder in it, then no crime has been committed. He doesn't even know a crime's been committed, so he knows what's in the bag. And toward that end, there was a lack of reasonable suspicion. Pardon? For instance, it was discussed about Mattus, and the difference with Mattus was that when the defendants left the pharmacy, the police knew what was in the bag. The pharmacist called and said, it's pseudoephedrine. Here, the officer doesn't even know what's in the bag. There's no basis for that, and that was part of the basis that the trial court said there's no reasonable suspicion, because until she tells them, he doesn't even know what's in the bag. The officer accomplished, through his questions, what he knew he lacked probable cause to do, which was search the car. And, of course, that's the nature of a Terry stop, right? You don't have probable cause to arrest somebody that either, A, a crime has been committed, or this person has committed the crime, but you think a reasonable, articulable suspicion that criminal activity is afoot. And so when you see people leaving, what do they sell at CVS that they don't sell at Walgreens? And even if there's a possible and innocent explanation, the law says that doesn't necessarily defeat even probable cause, let alone reasonable, articulable suspicion. So, I mean, is your position, and so I'm clear, so I just want to get this issue framed in my mind where we're at. Then is your position, then, that there was no reasonable, that the officer lacked reasonable, articulable suspicion to ask, to detain her in a Terry stop situation and ask questions about, gee, what's she buying? My answer is twofold. First is that it is my position that the officer lacked reasonable suspicion. The second answer is that the question here and the difference in each of the situations turns on whether the question is a general question or whether it's a focused, interrogative, investigative question. In Haviland, for instance, the question was general, whose is this? At that point, it wasn't even necessarily a question of whether a crime had been committed. It could be that somebody had a prescription. The question was, as the trial court noted in this case, one to determine who was the focus of the investigation. Rebecca Blair was the focus of this investigation. The officer was brought there strictly to question her and was questioning her about what was in the car. Because it was a focused interrogation, it's a different situation than one in which there's a general question that's positive. Well, it should have been in the car by herself to begin with. And they stop her, and I think she's buying methamphetamines. That's drugstore to drugstore. And I know her history, and so I think she's up to no good again. And the fact that they're only talking to her and they're asking her, you know, gee, what did you buy him? Is that a terry stop or is that a, like I said, if there's bubble gum and Dr. Scholl's foot powder in those bags, no crime has been committed. And the hypothetical you present, if she is the driver and she's pulled over for whatever traffic stop is appropriate. We'll say no traffic stop. We'll say you watched her stop at two or three drugstores and knows her history and sees her come up and knows the drill because you can only buy so much at each place without throwing up red flags. And decides, I think she's out here buying methamphetamines and decides I'm going to stop her and talk to her. And they stop her and talk to her and ask about what you've been buying. I believe he lacks reasonable suspicion under those circumstances to believe that the items that are removed in a bag, which is a common course of conduct for somebody shopping anywhere, again, it's different from a two's because in a two's, the officer knew that the purchase had been of something that's a precursor for meth. Here, the officer doesn't know that. He knows that she's gone into a store. The fact that she has an issue in her background, and this didn't amount to a conviction. It didn't even amount to a charge. This was a situation that had occurred in the past. To hold otherwise would suggest that anybody with a methamphetamine case in the background basically faces a lifetime ban from Walmart or CVS or else they're a suspect automatically because of the purchases. How often do you go from Walgreens to CVS to stop at multiple drugstores? Again, he doesn't have to be right. He's just got to be reasonable. But I don't know that it's reasonable. People go from one place to another depending upon whether what they have found is there. I don't find any necessary suspicion in the fact that the husband went separately from the wife. If you've asked what I would do, if I can avoid shopping with my wife, I'd do that. There is nothing suspicious about the behavior except given the background and except given the slant that the officer is putting on it. But in looking at whether the behavior, the real problem here and the difference, again, between Matus and this case is that we don't know what was purchased in any of those stores. And given that the items that were purchased are not inherently illegal or suspect, there was no basis for the officer to know at that time or to generate reasonable suspicion. And it should be noted the question was asked as to whether the registry had been checked. That was checked after the questions were asked. So it wasn't knowledge that the officer had at the time that he began his questions. Because he was asking those questions, believing her to be a suspect, doing so in a situation that was inherently coercive and dominated by police, because he was asking her to incriminate herself, Miranda warning should have been given in this case. If there are no further questions, I would simply ask that this court affirm the judgment of the trial court below. Thank you. Thank you. Mr. Nicolosi with Bobo. Thank you, Your Honors. A couple things. In that Matus case where a stop was justified and the appellate court affirmed that the propriety of that stop was based on a pharmacist calling the police saying that two men had just purchased pseudofedrine. Well, pseudofedrine is a legal product. That's pseudofed. That's used for colds and congestion and things like that. In that case, we knew that that's a legal product and there's nothing wrong with purchasing it. But that obviously was the basis for a stop and that stop was upheld. So that's why I think in this case we had, again, of course we don't know what was purchased at CVS and Walgreens, but we have more of a history to give the sergeant a context for his desire to go up and ask a couple of questions of the defendant. And that is, again, incidents involving drugs and people associated with drugs. And the defendant knew, or I'm sorry, Kijanowski knew that the defendant was involved in this world and he also had that special knowledge, that experience that going to separate drugstores, distancing yourself from these purchases is something that people who make methamphetamine, that's what they do. And he had that knowledge and that's what gave him the reasonable suspicion to go up and ask the very brief, very innocuous questions that he asked. And for that reason, the people, again, submit, as we did in our brief, that he had the reasonable suspicion to briefly investigate and question this individual. And he did. And the people would submit that the trial judge erred in granting a motion to suppress him. You said that the questioning was innocuous? It was brief and innocuous? Sure. So he said things to her like, so I have two meth-making materials already, you guys involved in the meth game, and I have charges waiting on you before this, and you're going to sit here and tell me that you need a coal pack and you need batteries? That doesn't sound brief and innocuous. It was brief. It wasn't innocuous. I will give you that. The whole conversation was very brief. I think the video demonstrates that pretty definitively. But the question, his first question was, what's in the bags? That was his first question. That is certainly, again, based on his observation, innocuous. Can I have that word stricken from the record, please? But it was just, that was certainly, I think, a reasonable question. And obviously Sergeant Kijanowski thought it was a reasonable question based on what he observed, based on what he knew. I don't think he should throw his experience and his knowledge out the window in being a police officer. I think he should use everything that he has learned based on individuals and based on general experience to investigate situations. And this vehicle was stopped legally, lawfully. Even the trial judge believed that the question was proper. The trial judge, of course, obviously believed that it should have come with Miranda or should have been preceded by Miranda. The people disagree and think that he had the reasonable suspicion to believe a crime was occurring and was justified in asking about her behavior at the drug stores. Are there any other questions? I'd be happy to entertain them. Thank you. We thank both of you for your arguments this morning. We'll take the matter under advisement and issue a written decision as quickly as possible. The court will stand in recess until 11 p.m.